IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

v.

                                    Case No: 6:24-cr-253-RBD-RMN

MIGUEL ANGEL AGUASVIVAS LIZARDO.

_____/

## SENTENCING MEMORANDUM IN SUPPORT OF A VARIANCE BELOW THE GUIDELINE ADVISORY RANGE

Miguel Angel Aguasvivas Lizardo, by and through his undersigned attorney, respectfully submits this Sentencing Memorandum for this Honorable Court's consideration. Mr. Aguasvivas requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553 and thus impose a sentence below the sentence advised by the United States Sentencing Guidelines. Specifically, Mr. Aguasvivas requests a sentence of 41 months incarceration.[1] This sentence would be "sufficient but not greater than necessary" to comply with the goals of sentencing. Mr. Aguasvivas also respectfully requests this Honorable Court make a recommendation to the Bureau of Prisons that he be placed in FCI Miami, so Mr. Aguasvivas can be closer to his minor children.

## STATEMENT OF FACTS

---

[1] As discussed later in this memorandum, this is the national average sentence of imprisonment for category I offenders in 2024 for the offense of money laundering. The median sentence was 21 months' imprisonment (50% of sentences were below and 50% or sentences were above 21 months). See Table 27.
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/2024_Sourcebook.pdf

On October 16, 2024, the government filed an Indictment charging Mr. Aguasvivas with one count of Conspiracy to Commit Money Laundering. Mr. Aguasvivas pled guilty to Count One of the Indictment, accepted responsibility, and avoided the Government and this Honorable Court from having to endure a lengthy trial.

Mr. Aguasvivas sentencing hearing is set for August 12, 2025. The Presentence Report (PSR) in this case calculates Mr. Aguasvivas's total offense level at 27 with a criminal history category I.[2] Thus, Mr. Aguasvivas is facing a sentencing range of 70 months to 87 months of imprisonment.

Although the sentencing guideline range recommends 70 - 87 months incarceration, the guidelines are merely advisory and do not restrict the Court's exercise of discretion to sentence him below the sentencing guideline range.

**I. The Sentencing Guidelines Do Not Restrict the Court's Exercise of Discretion.**

It is now well established that the Sentencing Guidelines are advisory only. United States v. Booker, 543 U.S. 220, 245-67 (2005). The court may consider every convicted person as an individual, and every case as unique. Gall v. United States, 552 U.S. 38, 53 (2007). To treat the guidelines as mandatory violates a defendant's Sixth Amendment rights, Booker, 543 U.S. at 244-245, and for the sentencing judge to treat the guidelines as presumptively reasonable is also error. Rita v. United States, 551 U.S. 338, 351 (2007). Thus, a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 53 (2007) (quoting Koon v. United States, 518 U.S.

---

[2] There are no objections to the guideline calculation.

2

81 (1996)).

**II.  The 18 U.S.C. § 3553(a) Factors**

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established . . .;
(5) any pertinent [Sentencing Commission] policy statement . . .;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

§ 3553(a)(1)-(7).

§ 3553(a)(1) - <u>the nature and circumstances of the offense and the history and characteristics of the defendant</u>

Mr. Aguasvivas is a young man of 35 years old who is a good father to his five children (four biological and one that he raises as his own with his ex-girlfriend).  He has the broad support of his family and is well liked in his community.  See Letters of Support, Exhibit A.

Mr. Aguasvivas is a devoted and loving father who has spent a tremendous amount of time with his children.  The time Mr. Aguasvivas has been incarcerated has been especially difficult on them.  Unfortunately, the mother of his 6-year-old daughter was tragically killed.  Mr. Aguasvivas's daughter is in therapy due to her mother's passing and her dad's absence.  Mr. Aguasvivas is heartbroken that he will spend a considerable amount of time in prison away from his children during their formative

3

years. He is a very present father and is always helping other people. Mr. Aguasvivas takes care of his children both emotionally and financially and a prolong period of incarceration will have a devastating impact on his children. His 6-year-old daughter currently does not have either parent present, which is taking a tremendous toll on her.

In determining Mr. Aguasvivas's sentence, this Court may consider that he is an excellent father to his children. See United States v. Pauley, 511 F.3d 468 (4th Cir. 2007) (affirming 42-month sentence for defendant convicted of possession of child pornography with an advisory guideline range of 78-97 months in part because "besides the criminal conduct at issue, Pauley was a . . . good father"). Furthermore, this Court should also consider the significant and negative impact that Mr. Aguasvivas's incarceration would have on his children. See Rosalyn D. Lee et al, The Impact of Parental Incarceration on the Physical and Mental Health of Young Adults, Pediatrics at 1188-1195 (April 2013) (stating that positive and significant associations were found between parental incarceration and health and mental issues including, but not limited to, depression, posttraumatic stress disorder, anxiety and fair/poor health).

Moreover, Mr. Aguasvivas grew up without his mother, and sadly, this had a significant negative impact on him. Mr. Aguasvivas was also physically beaten as a child as this was considered "normal" in his culture. Mr. Aguasvivas's unfortunate childhood is not an excuse for his actions, but it does help explain why good people sometimes make bad mistakes. Consequently, Mr. Aguasvivas became depressed at an early age and turned to alcohol and drugs to cope with his feelings.

Mr. Aguasvivas's long-standing substance abuse and alcohol problems had a significant impact on his decision-making. While drug addiction has often been viewed

as the result of a lack of willpower and character in the addict, experts generally agree that narcotic dependence is a form of mental illness. See Nat. Instit. of Drug Abuse, <u>Comorbidity: Addiction and Other Mental Illnesses</u> (Sept. 2010).

Addiction is "a complex brain disease characterized by compulsive, at times uncontrollable drug craving, seeking, and use despite devastating consequences – behaviors that stem from drug induced changes in brain structure and function." See <u>Id</u>. at 1. Mr. Aguasvivas's involvement in these related offenses is based on a recurring lack of judgment resulting from his significant drug habit. Thus, Mr. Aguasvivas's culpability is mitigated by his significant drug and alcohol addiction.

Mr. Aguasvivas realizes the mistakes that he made and how it affects his family. He has learned from his mistakes and has become a different person. Mr. Aguasvivas's conduct was an aberration and does not define his entire life. Mr. Aguasvivas has zero criminal history points and lack of criminal history. As stated by United States Probation in his PSR, Mr. Aguasvivas's lack of criminal history and his familial obligations are identified as factors that may warrant a sentence outside of the advisory guideline range.

<u>Acceptance of Responsibility</u>

Mr. Aguasvivas is terribly sorry for his actions and is deeply remorseful. In no way is Mr. Aguasvivas trying to minimize his role in the offense. Mr. Aguasvivas recognizes the wrongfulness of his conduct, and the seriousness of the crimes charged. Mr. Aguasvivas is heartbroken at the devastating impact his actions have taken on his family and his community. He wants this Honorable Court to know that he takes full responsibility for his misconduct. He is greatly apologetic for his involvement in this offense.

Mr. Aguasvivas's sentencing guideline range, however, is over representative of his conduct compared to others charged with money laundering. Mr. Aguasvivas was a money courier and not the one who actually laundered any money. Mr. Aguasvivas was not the typical money laundering offender who takes steps to make the illegally obtained money appear legitimate. Mr. Aguasvivas did not place, layer, and integrate the money back into the economy. Mr. Aguasvivas was charged in a conspiracy, but his role was only to pick up the money from one location and drop it off to another location. The sentencing guidelines do not distinguish between these two types of offenders – the offender who actually takes steps to launder the money and the offender who just transports the money from one location to another as a money mule. Again, Mr. Aguasvivas is not minimizing his actions in anyway. He helped support the conspiracy and will be punished for such conduct. But there ought to be a difference in the sentence from the one who actually launders the money to the one who just transports the money to the money launder. Unfortunately, the sentencing guidelines treat the two offenders the same, which is not representative of Mr. Aguasvivas's conduct.

In fact, because Mr. Aguasvivas was just the money mule, it is based on information and belief, that the Southern District of Florida, United States Attorney's Office, the primary investigating agency, was never going to charge him. Additionally, that office returned $273,244.00 of the seized proceeds.[3] It appears that it was only because of the unfortunate events of his ex-wife's passing that the Middle District of Florida, United States Attorney's Office, decided to charge Mr. Aguasvivas.

---

[3] Mr. Aguasvivas does not dispute the amount of $1,192,384 is the sum that would have been proved by the Government that was laundered or attempted to laundered.

§ 3553(a)(2) - <u>The Need for the Sentence Imposed</u>

    A.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

In imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany Mr. Aguasvivas's felony conviction. See <u>Hugh LaFollette, Collateral Consequences of Punishment: Civil Penalties Accompanying a Formal Punishment</u>, 22 J. of Applied Phil., 241, 244-46 (2005) (discussing and critiquing on proportionality grounds retributivist justification of collateral consequences).

Although Mr. Aguasvivas recognizes the seriousness of his offense, he respectfully submits that he will be subject to substantial punishment for the offense. As a result of the instant offense, Mr. Aguasvivas will have a felony conviction. As such, he will forfeit significant civil rights should he become a U.S. citizen including his right to vote, run for public office, or serve on a jury. Additionally, it is very likely that Mr. Aguasvivas will be deported back to Dominican Republic because of his conviction.

In imposing a just sentence, this Court should consider the significant punishment resulting from the collateral consequences of Mr. Aguasvivas's felony conviction. Prior to the instant offense, Mr. Aguasvivas had no criminal felony record. Now, based on his felony conviction, Mr. Aguasvivas will face an overwhelming number of collateral consequences. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017). Of these 641 collateral consequences, 497 (78%) of them

7

may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one court has emphasized the need for federal judges to account for such an impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months' imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). Notably, other probation offices, including the probation office in the Eastern District of New York, list the impact of collateral consequences as a ground for a variance in their PSRs.

   B. to afford adequate deterrence to criminal conduct

This factor refers to general deterrence or deterring other potential offenders. Deterrence as a penological theory assumes that defendants know the law, that the punishment can be structured in a manner that defendants will perceive its effect as outweighing the criminal action's immediate gain, and that defendants engage in rational decision making when choosing to engage in crime. These assumptions are false.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, increases in severity of punishments do not yield significant, and perhaps no, deterrent effects. Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). Three National Academy of Science panels reached the conclusion that certainty of being caught is a deterrent, but increasing in punishment isn't, as has every major survey analyzing the evidence. Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006); see also Zvi D.

Gabbay, <u>Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime</u>, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Finally, the National Institute of Justice has published an article that reaches five conclusions: 1. The certainty of being caught is a vastly more powerful deterrent than the punishment; 2. Sending an offender to prison is not a very effective way to deter crime; 3. Police deter crime by increasing the perception that criminals will be caught and punished; 4. Increasing the severity of punishment does little to deter crime; and 5. There is no proof that the death penalty deters criminals. National Institute of Justice, <u>Five Things About Deterrence</u>, United States Department of Justice (May 2016).[4]  A prison sentence will not further the goal of general deterrence.

      C.     to protect the public from further crimes of the defendant

The likelihood that a defendant will engage in future criminal conduct is a central factor that district courts must assess when imposing sentence.  <u>Pepper v. United States</u>, 562 U.S. 476, 492 (2011).  The Eleventh Circuit has also evaluated a defendant's risk of recidivism "as a basis for a sentencing departure."  See <u>United States v. Jayyousi</u>, 657 F.3d 1085, 1117 (11th Cir. 2011).

Mr. Aguasvivas will not engage in any future criminal conduct, since he poses a low risk of recidivism as he has no prior criminal history and has had consistent stable employment.  Mr. Aguasvivas is a different person since his arrest on these charges.  He understands the seriousness of his actions and is very remorseful.  He has admitted guilt,

---

[4] Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf

9

learned from his mistakes, has strong family ties, and is looking forward after his release to becoming certified in HVAC or continuing his career as a barber. Mr. Aguasvivas has had stable employment. Rates of recidivism drop with those that had stable employment a year prior to the instant offense. Thus, based on these factors, Mr. Aguasvivas poses a low risk of recidivism. See USSC, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, number 11 (May 2004).[5]

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Aguasvivas, this Court should consider the statistically low risk of recidivism presented by him. See United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007); see also United States v. Hamilton, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to recidivism not included in the Guidelines"); United States v. Urbina, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

Additionally, according to the best available evidence, prisons do not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011). Criminologists have consistently shown that those who are sentenced to prison have at best about the same rates of recidivism as non-imprisoned offenders, and in some cases a much higher rate. David Weisburd et al., Specific Deterrence in a Sample of

---

[5] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995) at 3; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). Thus, a shorter prison sentence will still protect the public from further crimes from Mr. Aguasvivas.

      D.      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Mr. Aguasvivas does have a long-standing substance abuse problem and thus requests a placement in a drug treatment program, such as RDAP. Mr. Aguasvivas's participation in such programs will reduce his risk of recidivism. Mr. Aguasvivas also requests mental health counseling. Mr. Aguasvivas respectfully submits that a below guideline sentence will provide him with sufficient time to participate in educational or vocational training as well as programs for drug treatment. Mr. Aguasvivas would like to enhance his job skills so that he will have gainful employment after his release.

§ 3553(a)(3) - the Kinds of Sentences Available

Because a mandatory minimum sentence does not apply, this Court may grant a variance in Mr. Aguasvivas's case.

§ 3553(a)(4) and (5) - the Guideline Sentencing Range Established; any Pertinent Sentencing Commission Policy Statements

Although the impact of the guidelines on a court's sentencing discretion has been discussed above, the critical question in Mr. Aguasvivas's case is the exact weight this Court should give to the guidelines. As recognized in Gall, district courts "may not

presume that the Guidelines range is reasonable." 552 U.S. at 49; see also Rita, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases are now potentially relevant in every case.

　　　　The guidelines pose a particular risk in Mr. Aguasvivas's case since they falsely provide a promise of predictability and fairness. We look to the guideline matrix, with its facade of mathematics, to relieve us of the uncertainty of unpredictable or irrational sentences. Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we often assume that they provide clear direction for the proper sentencing of every criminal defendant, notwithstanding their backgrounds and the particular circumstances of their case. Thus, we look to the guidelines to relieve us of the burden of having to decide a just sentence for the particular defendant. But the guideline ranges have often and dramatically let us down in creating results that are fundamentally unjust. For instance, for years, the guidelines for crack cocaine created a situation where defendants where harshly and unfairly sentenced.

　　　　In considering the appropriateness of applying an advisory guideline range in Mr. Aguasvivas's case, an analysis of sentences imposed in money laundering cases is especially critical. Such an examination demonstrates the sentences below the advisory range were imposed in a significant number of money laundering cases.

In 2024, the national average sentence for a category I offender convicted of the crime of money laundering was 41 months incarceration.[6] *See* U.S. Sent'g Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table 27. In 49.4% of money laundering cases, there was either a variance or downward departure (75.9% of cases if including government sponsored 5k1.1 and 5k3.1). *See* U.S. Sent'g Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table 31. And the average variance decrease from the guideline range was 55.9%. *See* U.S. Sent'g Comm'n, *2024 Sourcebook of Federal Sentencing Statistics*, Table 40.

Based on this analysis, most federal judges believe money laundering sentences are too harsh. To be sure, because of the recurring severity of guidelines in money laundering cases, the resulting sentences after *Booker* in these cases necessarily reflect widespread judicial disagreement with the guidelines as most of the sentences result in a variance or downward departure.

Moreover, the injustice created by the guidelines posed for Mr. Aguasvivas is that they, with their unwarranted facade of certainty, cannot account for the unique factors which support his requested variance. As one Eleventh Circuit jurist concluded, because there is often a conflict between the guidelines and the requirements of § 3553(a), the guidelines may have little persuasive force against the § 3553(a) factors. See United States v. Glover, 431 F.3d 744, 752-53 (11th Cir. 2005)(Tjoflat, J.), *abrogation on other grounds*, United States v. Joseph, 371 Fed.Appx. 70 (11th Cir. 2010) (unpublished).

---

[6] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/2024_Sourcebook.pdf

13

§ 3553(a)(6)- <u>the Need to Avoid Unwarranted Sentence Disparities Among Defendants with similar records who have been found guilty of similar conduct</u>

As noted in the preceding section, judicial disfavor with the money laundering guidelines has resulted in a below-guideline sentence in 75.9% of national money laundering cases in 2024. Thus, a mechanistic application of the PSR's recommended guideline range will result in a sentencing dichotomy between these cases and Mr. Aguasvivas's case. Considering the types of sentences that have been imposed nationally, Mr. Aguasvivas submits that his requested variance will avoid an unwanted disparity. Based on the national statistics demonstrating consistent and substantial variances in money laundering cases, Mr. Aguasvivas submits that a variance is especially warranted in his case.

§ 3553(a)(7) - <u>the Need to Provide Restitution to Any Victims of the Offense</u>

Not applicable as there is no restitution or victims in this offense.

**III. Conclusion**

The circumstances presented in Mr. Aguasvivas's case justify a variance from the Sentencing Guidelines. Because the decision in <u>Booker</u> has made the Guidelines advisory and the parsimony clause of § 3553(a) the paramount consideration, the history and characteristics of Mr. Aguasvivas show that a sentence below the advisory guideline range is "sufficient but not greater than necessary" to comply with the goals of sentencing. Mr. Aguasvivas, therefore, requests this Court to impose a variance below the applicable guideline range and sentence him to 41 months incarceration followed by one-year supervised release.

Respectfully Submitted:

s// Brett Meltzer

Brett Meltzer, Esq.
Law Office of Brett Meltzer
PO Box 1162
Windermere, Florida 34786
Florida Bar No. 772631
Phone: (407) 953-6271
Primary: brett@brettmeltzerlaw.com
Secondary: brett.meltzer@aol.com
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I HISEBY CERTIFY that on August 5, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court, by using the CM/ECF system.

s/ Brett Meltzer

Brett Meltzer, Esq.
Attorney for Defendant

15